1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                      EASTERN DIVISION-RIVERSIDE

4                               - - -

5           HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

6                               - - -

7    UNITED STATES OF AMERICA,          )
                                        )
8                         Plaintiff,    )
                                        )
9              vs.                      )   No. EDCR 12-92(A)VAP
                                        )
10   SOHIEL OMAR KABIR,                 )
     RALPH KENNETH DELEON,              )
11   MIGUEL ALEJANDRO VIDRIALES SANTANA,)
                                        )
12                        Defendants.   )
     _____)
13

14

                REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS
15
                         Riverside, California
16
                        Monday, April 29, 2013
17
                             2:51 p.m.
18

19

20

21

22                    PHYLLIS A. PRESTON, CSR, FCRR
                      Federal Official Court Reporter
23                     United States District Court
                           3470 Twelfth Street
24                    Riverside, California 92501
                           (951) 205-7959
25                         stenojag@aol.com

```
 1    APPEARANCES:

 2

 3    For the Plaintiff:

 4                         OFFICE OF THE UNITED STATES ATTORNEY
                           By:  SUSAN DEWITT
 5                               CHRISTOPHER GRIGG
                                 ALLEN CHIU
 6                         Assistant United States Attorneys
                           3403 Tenth Street, Suite 200
 7                         Riverside, California 92501

 8

 9

10    For the Defendant Kabir:

11                         OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           BY:  JEFFREY AARON
12                               ANGELA VIRAMONTES
                                 MATTHEW LARSEN
13                         Deputy Federal Public Defenders
                           3801 University Avenue, Suite 150
14                         Riverside, California  92501

15

16    For Defendant Deleon:

17                         RANDOLPH DRIGGS
                           BY:  CJA  Appointed Counsel
18                         625 The City Drive, Suite 375
                           Orange, California 92868
19

20    For Defendant Santana:

21                         ROBERT SCOTT
                           CJA Appointed Counsel
22                         125 Business Center Drive, Suite C
                           Corona, California 92880
23

24

25
```

```
 1              MONDAY, APRIL 29, 2013; RIVERSIDE, CALIFORNIA

 2                            -o0o-

 3              THE CLERK:  Item No. 9, 12-092(A) VAP, United States

 4  of America v. Sohiel Omar Kabir, Ralph Kenneth DeLeon and

 5  Miguel Alejandro Vidriales Santana.                           02:51

 6              Counsel, please state your appearance.

 7              MS. DEWITT:  Good afternoon, Your Honor.  Susan

 8  DeWitt on behalf of the Government.

 9              MR. GRIGG:  Good afternoon, Your Honor.  Chris Grigg

10  for the Government.                                           02:51

11              THE COURT:  Thank you.  Good afternoon.

12              MR. AARON:  Jeffrey Aaron for the Federal Public

13  Defender for Mr. Sohiel Kabir.

14              MR. LARSEN:  Matthew Larsen also for the Federal

15  Defender's office for Mr. Kabir.                             02:52

16              MS. VIRAMONTES:  Angela Viramontes on behalf of

17  Sohiel Kabir.

18              THE COURT:  Thank you.

19              MR. DRIGGS:  Randy Driggs, Your Honor, on behalf of

20  Ralph DeLeon who is present in custody.                      02:52

21              THE COURT:  Thank you.

22              MR. SCOTT:  Rob Scott for Mr. Santana, Your Honor,

23  who is present in custody.

24              THE COURT:  All right.  Thank you.

25              There are a number of motions on calendar in this   02:52
```

1   matter.  I've prepared a written -- and the clerk has

2   distributed -- a written tentative on the Motion to Dismiss.

3   And before I get to the other motions, does either side wish to

4   be heard on that?

5           MR. LARSEN:  Your Honor, we'll submit on the papers.   02:52

6           THE COURT:  All right.  Let's take up the other

7   motions.

8           First, the motion to unseal, which is found at Docket

9   No. 93.  Both sides -- maybe I should say "all sides" because

10  there is more than one defendant, but there have been a number   02:53

11  of sealed filings.  I review -- every time a party seeks to

12  file something under seal, I carefully review the affidavit

13  because I don't always grant them.  And I followed that

14  procedure in connection with this case, just like any other

15  case.  There was good cause, at the time, that all of these   02:53

16  documents that are mentioned in the motion were filed under

17  seal.  Almost all of them, the sealing order was signed by me.

18  There was one, I think, that was signed by the magistrate judge

19  before the case was assigned to me.

20          After reviewing the motion, I went through and   02:53

21  reviewed each one of these again and found that my initial

22  sealing order was appropriate.  But I'll further say that as to

23  documents -- the documents found at Docket Nos. 25 and 27,

24  those documents have already been provided to the defendant.

25  And so far as the motion addresses Document No. 2, those   02:54

1   documents have been unsealed.

2          Without revealing the contents of what I previously

3   ordered sealed, I will just say, in general, that it is not

4   uncommon in any criminal proceeding for a defendant to seek

5   approval of outside services, and those are commonly -- or          02:54

6   almost always, as far as I know -- filed under seal.  Many of

7   the documents that this motion seeks to have unsealed were not

8   documents filed by the Government.  But again, as I said, I

9   reviewed each and every sealing order, and there is no good

10  cause at this time to unseal any of them.                           02:55

11         So I intend to deny that motion.

12         As to the motion for disclosure -- well, let me take

13  up ones I think are -- well, as to the Motion for Disclosure of

14  Government's Witness List, the Government -- which is at Docket

15  No. 92 -- the Government's response, in part, is that it          02:55

16  doesn't intend to call any witnesses who are located in Germany

17  or Afghanistan, or who are UN employees.

18         That doesn't entirely resolve the motion, but it

19  does, in terms of the timing of when the witness list will be

20  -- when I'll order them to be exchanged and disclosed, that        02:55

21  does allay the concern that would be necessary to travel to

22  investigate the Government's witnesses, if they are located in

23  Germany, Afghanistan, et cetera.

24         The Motion for Discovery of the Government's Key

25  Documents and Conversations, which is Docket No. 95, as best I     02:56

1  can tell in this motion, the defense seems to be asking that

2  the Government designate -- among the documents that it

3  produces or has produced -- which ones fall into the category

4  of *Jencks* material, which ones are *Brady* material, which ones

5  would be categorized as relating to 404(b) issues, et cetera.          02:56

6           There is no basis for that motion at this point, and

7  I would deny it.

8           The Motion For Disclosure of Confidential Source

9  Information, Docket No. 94, I will set up, you know, some

10 future dates, but at this point I think that the motion is          02:56

11 premature.  The Government indicates it hasn't decided whether

12 it's even going to call the confidential source as a witness,

13 and it has already provided information regarding payments,

14 criminal history, and immigration benefits.  The Government --

15 and we may need to revisit that later, but not at this point.          02:57

16          The Motion to Provide Unredacted Discovery, which is

17 Docket No. 98, according to the Government, at least as of the

18 time it filed its opposition, it has so far produced 2500 pages

19 of discovery, roughly, more than 60 CDs and DVDs of audio and

20 video recording, seven CDs and DVDs of digital device data and          02:57

21 pull camera footage.  And when it did so -- I think it was at

22 the time that it disclosed that the -- there were information

23 given identifying the date of each recording contained therein.

24          It does -- some of the examples that the defense gave

25 of material, which has been so heavily redacted that it is of          02:57

1    no use to them, I'll hear argument about that point.

2           The Motion For Discovery, which is Document No. 97,

3    to the extent that it seeks plea agreements, if there are or in

4    the future are any plea agreements, as I said, you know -- and

5    the documents regarding the circumstances of Mr. Kabir's

6    arrest -- I would deny the motion as to those.

7           The defendant -- I mean, to the extent that the

8    defendant may have or believe he has a Bivens action for

9    excessive force because of his treatment at the time of the

10   arrest, that's entirely a separate issue from this lawsuit.

11          The defense argues that the information regarding the

12   circumstances of his arrest, his medical treatment, and so

13   forth, are relevant because his injuries may have influenced

14   his ability to understand his rights in order to knowingly

15   waive them and to communicate with Government agents.

16          So with respect to medical treatment, I might allow

17   or order that to be turned over, if there was any medical

18   treatment given.  So I'll hear argument on that.

19          And again, as to the identity of the informant, the

20   Court eventually -- again, I think it's premature, but

21   eventually, if the Government is going to call that person as a

22   witness, or perhaps even if the Government does not, the Court

23   has to consider a number of factors.  Taking -- under the

24   *Roviaro* case, the Supreme Court said ...*taking into*

25   *consideration the crime charged, possible defenses, and*

1    *possible significance of the informer's testimony.*

2              But again, here we don't even know if there is going

3    to be testimony.  So I can't really address that at this time.

4              The parties seem to be under -- well, the Government

5    seems to be under a misapprehension of what was said at the          03:00

6    last hearing because I did not intend to communicate -- and I

7    don't believe I did communicate -- that I was setting a

8    tentative trial date; it was not a tentative trial date.

9              The Government argued fiercely that the trial date

10   that the Court set was unrealistic and, apparently, in the           03:00

11   minds of Government counsel, it was tentative.  But it was not.

12             Now, both sides seem to be in agreement on just one

13   thing here, which is that the current trial date of August

14   the 6th and the pretrial conference date are such that the

15   defense could not be ready to proceed.  And I think the              03:00

16   Government's position is, more or less, that they could not --

17   they would not be ready to proceed, either, because of the

18   number of documents and so forth that have to be turned over in

19   discovery eventually.

20             Moving the trial date -- which I think we should           03:01

21   start with that, if counsel want to argue for that -- would

22   pose a number of problems, and that's why I gave notice to

23   counsel that it was not a tentative trial date.  It was the

24   trial date.

25             I have a complex -- I have three complex criminal          03:01

1    trials set:  This case, a complex case set for September 17th,

2    and another one set for October 29th.  I have reason to believe

3    that both of those other cases at least some of the defendants

4    are going to go to trial.  So it's not an issue here whether I

5    could continue the case for a month, because this case would          03:01

6    then bump into the case I have set for September 17th.

7              So I will listen to argument from counsel about the

8    trial date, and then I intend to set dates for designation of

9    experts, a preliminary witness list, transcripts of any

10   recordings that the Government intends to use in its                  03:02

11   case-in-chief, information about the confidential source, if

12   appropriate, and we can discuss that.  But first, I think we

13   should discuss -- or counsel can discuss with me their concerns

14   regarding the trial date.

15             Ms. DeWitt?                                                 03:02

16             MS. DEWITT:  Your Honor, could I have a chance to

17   talk to counsel for a second just to confer with them about a

18   trial date?  Because --

19             THE COURT:  Well, that brings up the other point.

20             Counsel -- defense counsel, in the reply on these          03:02

21   motions, said that there is no requirement under the -- my

22   standing order, the Federal Rules of Criminal Procedure, the

23   local rules to meet and confer before motions are filed, which

24   is technically accurate, but it does seem to me that there

25   should have been a better communication between counsel because      03:03

```
 1    at least some of these issues could have been resolved.

 2            So I hope in the future that motions that are

 3    presented in this case will only be about things that counsel,

 4    in good faith, could not resolve ahead of time.

 5            But go ahead and take a moment to discuss the trial      03:03

 6    date with Mr. Aaron, if you like.

 7                    (Counsel conferring.)

 8            THE COURT:  All right.  Ms. DeWitt?

 9            MS. DEWITT:  Your Honor, having conferred with

10    counsel for each of the defendants, what we would like to      03:04

11    propose is a date in early 2014 that is -- that works with the

12    Court's calendar because I think that will allow everybody

13    sufficient time to work through these issues, as well as

14    pretrial motions, and will not conflict with your current

15    complex, other complex cases, I'm hoping.  I know you have many  03:04

16    other things on your calendar, as well, but I think if we put

17    it out that far -- and I know that's a little bit father than

18    the Court normally would like to do --

19            THE COURT:  Well, normally, I don't grant

20    continuances.                                                   03:05

21            MS. DEWITT:  I understand.

22            THE COURT:  All right.

23            MS. DEWITT:  I understand.  And I would hope that

24    because of the unusual nature of this case that we could do

25    that, because I think it's in everyone's interest -- everyone   03:05
```

1   -- all the parties' interest and, hopefully, it will also inure

2   to the Court's benefit, as well.

3            THE COURT:  Mr. Aaron?

4            MR. AARON:  That's correct, Your Honor.

5            Your Honor, I will get into this, if the Court will          03:05

6   allow argument on some of the discovery issues, because I think

7   that a certain amount of discovery and investigation, at least

8   from the defense perspective, needs to be done in at least one

9   of two foreign countries; that is, Afghanistan.

10           We think that, to the best that we can assure the          03:05

11  Court at this point, if the Government will be able to fulfill

12  its discovery obligations by early 2014, the defense will be

13  able to get the material and to investigate it.

14           THE COURT:  Well, if you're proposing a trial date in

15  January of 2014 --                                                     03:05

16           MR. AARON:  I was thinking more like February, March,

17  early in the year, but I understand.

18           THE COURT:  All right.

19           MR. AARON:  Of course, any additional time is good.

20           And from the defense perspective, since we don't know     03:06

21  when we're going to get this discovery and we don't know what

22  that discovery will consist of, and we don't know -- simply

23  because the Government says, *I'm going to be calling a United

24  States national witness and here he is*, the witnesses who may

25  impeach him from the defense perspective may live in              03:06

1    Afghanistan, and that may require us to spend more time to get

2    an interview and obtain the attendance of that witness than it

3    would be for the Government just to call the American national

4    witness.

5            So that would take more time.                          03:06

6            We think that, given the fact that all parties are

7    trying to work to resolve those issues, early in 2014 would be

8    best.

9            THE COURT:  Well, I was going to suggest a trial date

10   of November the 19th, assuming that there is good cause for any  03:06

11   continuance, which would move the pretrial conference date to

12   November the -- probably have it more than a week ahead of

13   time, but probably set the pretrial conference on something

14   like November the 4th.

15           It's the parties' positions that that would not give   03:07

16   the defense -- well, that that would not give the Government

17   enough time to comply with all the discovery responsibilities,

18   and the defense not enough time to prepare for trial.

19           MS. DEWITT:  Your Honor, we will continue to do our

20   best to produce discovery as quickly as we can.  So I think    03:07

21   that this is in an abundance of caution.  I mean, the concern

22   is for the defense.  And I don't want the defense to be able to

23   claim, at the end of the day, that they did not have adequate

24   time to prepare due to the time that it's taking us to produce

25   discovery.  So I guess my recommendation would be to error on   03:07

1    the side of a later trial date.

2              But if the Court sets those dates, we will do the

3    best we can with the Court's dates.

4              THE COURT:  All right.  I'll come back to the date,

5    then.                                                                03:08

6              I will grant the request for a continuance from the

7    current trial date, which is in August.

8              So let's move on to discussion of the other motions.

9              MR. AARON:  Your Honor, I don't mean to try the

10   Court's patience, but there is an important --                       03:08

11             THE COURT:  You haven't come close yet today.

12             MR. AARON:  Today.  Thank you.

13             THE COURT:  But I'll let you know.

14             MR. AARON:  The Government has some problems

15   getting -- I believe getting information from Washington, or        03:08

16   from other agencies because of the security issues.  That's

17   delaying, to the best I understand it, that's delaying some of

18   the defenses' access to materials.  We don't know how much

19   that's going to delay the information in the future.  So when

20   the Court considers a trial date, it might be useful to bear        03:08

21   that in mind.

22             In terms of the other motions, I'm prepared to

23   address all the other discovery motions now, if the Court

24   wishes.

25             THE COURT:  And what I think the parties -- well, and     03:09

```
 1   particularly the defense -- should focus on is the issue with
 2   the redacted materials.
 3            But go ahead.
 4            MR. AARON:  I will get to that motion, Your Honor,
 5   but I would like to say just a couple of words about some of        03:09
 6   the other motions.  For example, the witness list.
 7            Your Honor, I understand that the prosecution at this
 8   point says it's not going to call the confidential informant.
 9            THE COURT:  I think it said it hadn't made a
10   decision.                                                            03:09
11            MR. AARON:  That being the case, it's more crucial
12   than ever that we get the information regarding their witness
13   list and the information about the confidential informant.  I
14   would point out that we've received some 270 hours of
15   conversations involving the confidential source over some 63        03:09
16   DVDs or CDs, whatever.  Many of those conversations involve
17   Arabic sprinkled throughout, whether in longer passages or
18   short remarks, when the informant is speaking to another person
19   we believe not a law enforcement person, but we don't know that
20   for sure.  Just to find -- and we haven't even been able to         03:10
21   find an expert yet who would be able to spend 269 hours and
22   some change listening to all of those tapes, but the cost --
23   just at the interpreter rates -- would be over almost $11,000.
24            THE COURT:  But you're making the assumption that an
25   interpreter is going to have to listen to all of those hours,       03:10
```

1  when you just pointed out a moment ago that there is -- most of

2  the conversations are not in Arabic; there is a word or two, or

3  perhaps a sentence or two here or there.  So that's not really

4  necessary, then, for an interpreter to listen to all of the

5  hours of recorded conversations, is it?                          03:10

6          MR. AARON:  I believe actually there is passages in

7  which the confidential source is speaking to another person,

8  and they're sprinkled throughout the tapes.  And yes, it's

9  possible if we edited the tapes and spent --

10         THE COURT:  To put it simply, somebody in your          03:11

11 office, an attorney, presumably, but somebody in your office is

12 going to listen to all of that material.

13         MR. AARON:  Yes, someone is listening.  That's how we

14 know the information we know so far.  Someone is listening.

15         THE COURT:  So my point is that since large -- and if   03:11

16 this presumption is incorrect, but my presumption is that large

17 chunks of it would not need the assistance of an Arabic

18 interpreter; some parts will.  But certainly, someone in your

19 office is listening to everything, and then you would be able

20 to determine which parts of it you need to get an interpreter   03:11

21 for.

22         It seems to me a faulty premise that just because

23 there are almost 300 hours of recordings that the interpreter

24 has to listen to all 300 hours.

25         MR. AARON:  I suppose the interpreter could listen      03:11

1    and translate the Arabic out of context, but that might create

2    a different problem in that the conversation may be referring

3    to matters which are --

4         THE COURT:  Well, I'm assuming that they are going to

5    listen to it within context.  It's not going to be an isolated          03:12

6    word or an isolated sentence, but it's going to be some of the

7    material before and after to give it context.  I still don't

8    think that amounts to listening to every single conversation.

9    If some of them were entirely in English, then I don't know why

10   the interpreter would need to listen to that.                           03:12

11        MS. DEWITT:  Your Honor, if I might?

12        I believe that the Court is exactly right.  The

13   percentage that is in Arabic is an extremely small part of

14   these tapes, and most of those conversations are in fact

15   completely irrelevant when the confidential source simply is           03:12

16   taking a personal call, or something that's unrelated, and he

17   is unable to turn off the recording device.  So the percentage

18   is very small.  They're irrelevant.  Obviously, the defense

19   counsel will need to make that assessment for themselves, but I

20   can say that it is my belief, based on my review of these              03:13

21   tapes, that it is a very, very, very small percentage of the

22   overall tapes.

23        The only exception to that is, is that sprinkled

24   throughout all of these tapes is the use of Islamic words.  But

25   those are commonly used words by his client and others, and is        03:13

1    easily translatable.  But other than those, the percentage

2    that's in Arabic is it is a very, very small portion of the

3    overall --

4            THE COURT:  Well, the Indictment itself contains a

5    number of words, and the parties may dispute the translation,      03:13

6    of course, but, I mean, there is a lot of that in the

7    Indictment itself.

8            MS. DEWITT:  And those are one type of technically

9    foreign language words.  But other than that, the percentage is

10   a very small percentage that I believe is either completely or     03:13

11   largely irrelevant.

12           THE COURT:  All right.  Mr. Aaron, you can finish

13   your argument.

14           MR. AARON:  So far, Your Honor, I have not needed the

15   assistance of an Arab language translator to read the              03:13

16   Indictment or the Complaint.  I do understand --

17           THE COURT:  Well, I did.

18           MR. AARON:  I do understand --

19           THE COURT:  I had to look up several of the words in

20   it.                                                                03:14

21           MR. AARON:  Several of those words I do understand,

22   but I'm talking about the conversations which he's having with

23   a third person, or maybe a fourth person even, who is not

24   present.  We don't know what those conversations consist of.

25   The Government may say that they're irrelevant.  The informant     03:14

1    may say they're irrelevant.  But we would prefer to see for

2    ourselves.

3            THE COURT:  Of course.  But that doesn't -- and I

4    understand that, that you're not going to be likely to accept

5    the Government's representation that a conversation that the CS          03:14

6    was having was irrelevant, without getting it translated.

7            But the point, I think, that I'm still persuaded

8    about is that it's not, in terms of the amount of time that you

9    need, it's not necessarily going to be the case that you need

10   an interpreter to go through all of the almost 300 hours that          03:14

11   you have here.

12           MR. AARON:  One of the reasons -- I was bringing this

13   up in terms of the argument for the witnesses.  One of the

14   reasons why we needed the witnesses earlier rather than later

15   is so that we can do all the translations that might be                03:14

16   necessary.

17           Another reason is, as I mentioned before, the

18   Government may call someone who is a United States national who

19   is here living in Orange County, but to rebut that testimony,

20   or investigate it, we would have to conduct an interview of            03:15

21   someone in Afghanistan, which we have been trying to do but is

22   extremely difficult.  We might need Afghani NATO, other foreign

23   nationals.  We don't know whether -- we might need Americans

24   who are deployed.  So that was very difficult.  So we would

25   need to know who they are intending to call so that we can             03:15

```
 1    investigate and call those people, if necessary.
 2              So that's why we would like discovery sooner rather
 3    than later.  And that was one of the things that was mentioned
 4    by --
 5              THE COURT:  But the Government's decision on what        03:15
 6    witnesses to actually call at trial -- I understand there is
 7    some unusual circumstances in this case, particularly the need
 8    to do some investigation in Afghanistan, but it's unrealistic
 9    to think that the Government is going to make a decision about
10    which witnesses to call three months or six months before       03:16
11    trial.  And there is no obligation, as everyone knows -- it's
12    generally no obligation to give Jencks material until after the
13    witness has testified.
14              So, you know, I think we need to talk about -- my
15    intention is -- and this is what counsel should discuss with     03:16
16    respect to a trial date -- is a preliminary list of witnesses
17    that can be supplemented.  But at least the defense would get a
18    number of the witnesses that the Government knows is going to
19    call at trial, at a reasonably early date before the pretrial
20    conference.                                                      03:16
21              MR. AARON:  I think that would be an excellent idea.
22              And I would note there is some witnesses we know are
23    going to be called -- we're almost certain they are going to be
24    called -- but we don't know who they are yet.
25              For example, my client was interrogated, I think, for  03:17
```

almost two weeks while he was in Afghanistan.  We haven't had

reports of any of that.  We don't know who those persons are.

We don't know if it was CIA, or military intelligence, or if

Afghan nationals were involved.  But I'm almost certain that

the Government is going to use some of that material, and we

don't know who those persons are.

In terms of -- it kind of leads into my next point

regarding the motion for key documents and conversations.  I

think really the gist of this argument here is that we wanted

the key conversations.  We know that there is certain

conversations that the Government is going to use, but there

may be others out there within the 270 hours.

We have a lot of tapes.  We have a lot of

conversations.  The Government didn't identify the speakers on

the tapes, so we're scrambling, trying to figure out who the

speakers on the tapes are.  We don't even know that, and that

makes it extremely difficult.

The Court, when it ruled -- or gave its tentative on

the Motion for the Discovery of the Confidential Source

Information said that we received data regarding payments.

That is correct, so far as it goes, but it's not dated; that

would be helpful for us in our cross-examination of the

informant.  We have received information that the source has

received some $250,000, I believe, over the last five years.

But we don't know -- I think we're entitled to a schedule of

1    payments.  We are entitled to see what he was paid during the

2    pendency of this case and in other cases, as well.  That's how

3    we would cross-examine him, based on his desire to get even

4    more money from the United States government by helping to

5    incriminate these young men.                                    03:18

6              The Court did want to hear arguments about the

7    unredacted discovery.

8              Basically, Your Honor, our view is that the

9    Government failed completely to comply with 26.2, which

10   requires them to claim a matter of privilege or relevant to the  03:19

11   Court so that the Court can inspect the material.  There has

12   been none of that.  For the Government to say, *Well, defense,*

13   *identify what you want to be redacted and why*, shifts the

14   burden to us when the burden is on the Government, according to

15   the Rule.  They are the ones who have to say what is privilege   03:19

16   or what is irrelevant, and then the Court has to sustain that.

17             THE COURT:  I mean, it's not a workable solution at

18   this point, at least I don't think it is, that I'm going to

19   review every page where there are redactions.  So what I'm

20   concerned about is what is a -- I mean, there may well come a     03:19

21   point, and I've certainly done it in other cases, so I wouldn't

22   rule it out by any means -- that I am going to review some

23   documents with redactions and make a determination about a

24   privilege, but not -- I am a little troubled at this point

25   because there seems to me a possibility that the volume of       03:20

1  documents with extensive redactions is such that that's not a

2  workable solution.

3        So I think that, Ms. DeWitt, you should address that

4  issue.  In particular, the issue that Mr. Aaron raises with

5  respect to the Government having the burden when it deletes        03:20

6  information claiming a privilege.

7        MS. DEWITT:  Yes, Your Honor.

8        First, the problem is that many of the documents that

9  have been identified are not Rule 26 statements of a witness,

10 and in many instances we won't know whether they might arguably   03:20

11 be statements of a witness until we actually refine our witness

12 list.  And that, in and of itself, will significantly reduce

13 the burden on the Court, in terms of reviewing potential areas

14 where we have some disagreement with counsel.

15        THE COURT:  Maybe I'm confused.  Let me ask you about      03:21

16 this a little bit more because maybe I'm confused.

17        The documents -- well, let's talk about categories of

18 the documents.  That might be the easiest way to do it.

19        If you turn over a 302, or whatever the number is for

20 other agencies, of a witness statement, but it's not a witness    03:21

21 that you're going to -- that you're going to call to testify at

22 trial, what's your position about redactions in those

23 documents?

24        MS. DEWITT:  That would not fall under Rule 26.2 as

25 to the witness about whom the statement is taken.  It could       03:21

```
 1    arguably be a witness statement for the agent taking the
 2    statement.
 3            THE COURT:  Right.  And you may call that agent.
 4            MS. DEWITT:  Right.  So there's two different types
 5    of categories where that may in fact become a statement.
 6            I anticipate there will be very few agents called in
 7    this case.  There is an argument that even these would not fall
 8    strictly under Rule 26.2 as to the -- for example, the
 9    confidential source, because they are not under oath, they're
10    not verbatim, they're not adopted by him.  They are reports by
11    the agent.  But our policy is to produce them nevertheless.
12            I will add that there are some -- there is some
13    information in those reports that is redacted, for reasons that
14    we laid out in our opposition brief, including that they
15    include personal identifying information, cross-references to
16    pending investigations, or other classified information or law
17    enforcement sensitive information that can be -- but that are
18    not themselves actually the statement of that particular
19    witness.  And that's where you get into an another gray area.
20            THE COURT:  Well, you also get into the issue of why
21    the parties -- or the inability of the parties so far to enter
22    into a protective order.  Because, for example, to the extent
23    that any of the documents that are being exchanged in
24    discovery, or turned over in this case in discovery, by the
25    Government, have, you know, references to personal -- when you
```

03:21

03:22

03:22

03:23

03:23

1   say *personal identifying information*, I take that as referring

2   to the kinds of information that the local rules require

3   counsel to redact, such as anything that would refer to a

4   personal phone number, an address, and so forth.  So that

5   obviously should be redacted.  The local rules require it.          03:23

6          MS. DEWITT:  Yes.

7          THE COURT:  It seems to me that there is some -- I

8   mean, that's, to me, such a simple question that, again, if the

9   parties had entered into a protective order, that the

10  Government would comply with the requirements to redact that        03:23

11  sort of information.

12          That would take care of that issue.

13          MS. DEWITT:  We are sort of caught between the horns

14  of a dilemma, which is on the one side we are accused of

15  over-redacting, and on the other side we have to go back, in        03:24

16  some instances, and redact more.  Whereas a protective order

17  might allow us to produce some of this information in a less

18  redacted form.

19          I will be very candid with Your Honor.  We have

20  struggled very hard to try to come up with a protective order.      03:24

21  But we have on one side the position -- and we've met and

22  conferred and tried to work this out a number of times with

23  counsel, and the positions are -- defense counsel's position is

24  nothing is appropriate in this case for any -- no protective

25  order for anything.                                                 03:24

1          And our position is that there is sensitive

2  information that has to be -- that has to be protected, for a

3  variety of reasons.

4          And keeping in mind the Court's order, we are trying

5  to figure out what an appropriate way is to carve this out.          03:25

6          THE COURT:  Well, some things have to be redacted.

7  And personal identifying information has to be redacted.  The

8  rules require it.

9          MR. AARON:  Your Honor, if I can respond?

10         First, personal information needs to be redacted for          03:25

11  court filings.

12         Second, it is not correct to say that the defense did

13  not believe that a protective order would be inappropriate for

14  any information.  I specifically remember discussing with

15  Ms. DeWitt, telling her that, yes, if there is a case in which          03:25

16  an agent is in the field or it's the identity of a CIA agent

17  who is undercover, or something like that, where there may be

18  harm to a person, yes, of course, we would believe that that

19  information should be protected and we would be willing to

20  enter into a protective order for that.  But simply for          03:25

21  information regarding many of these things here, I cannot --

22         THE COURT:  Counsel, I understand your point about

23  wanting to know a schedule of payments that have been made to

24  the CS, at least at some point.  But information that may be

25  contained regarding other ongoing investigations that the CS is          03:26

 1  involved in, I think I would agree with the Government that

 2  information could be redacted.

 3        It seems to me that there ought to be some common

 4  ground here.  And I'm disappointed that the parties have not

 5  been able to at least resolve some of the differences regarding      03:26

 6  a protective order, and then to the extent that differences

 7  remain, I'll rule on them.

 8        MR. AARON:  Your Honor, it seems to me that the fact

 9  that the informant, for example, is engaged in other

10  investigations, that should be admissible.  That goes to the      03:26

11  degree of the informant's cooperation with the Government, his

12  motive in continuing to cooperate with them, and the

13  appropriateness of the financial remuneration that he receives.

14        The contents of those other investigations, that may

15  be protected or that may be irrelevant.  But what the      03:26

16  Government has done here is has done a wholesale redactions

17  sometimes of complete pages and paragraphs.  And that, I don't

18  think that they've really identified an appropriate reason for

19  doing that.

20        THE COURT:  Ms. DeWitt.      03:27

21        MS. DEWITT:  I think the Court is exactly right, that

22  other investigations do not need and are not appropriate to be

23  produced, for a whole variety of reasons, and that is a

24  significant part of what I believe he's referring to where

25  there has been those kinds of extensive redactions.      03:27

1           We've already indicated, in a public unsealed filing,

2   that this source has been a source for the Government for more

3   than four-and-a-half years now, five -- approximately five

4   years.  And it's clear, from what we've produced, when he

5   became involved in this investigation, and it's clear that          03:27

6   there is a period of time that preceded that.  So it's clearly

7   within the defenses' knowledge that he's been involved in other

8   investigations.  That's fair game for cross-examination.  The

9   fact of those other investigations, the fact that he's been

10  paid, the amount of money that's he's been paid, is fair game.      03:28

11  We don't disagree with that.

12          And we've offered to sit down with counsel and

13  discuss individual documents that he has disagreements about

14  with respect to the redaction.  There are some documents that

15  were produced very early on in this case that may have been        03:28

16  somewhat heavily redacted.  We're the first to say that that

17  may have been the case because we were attempting to get

18  discovery out to counsel pre-Indictment, very, very early.

19          And we're happy to sit down and go over specific

20  documents, but I think in terms of the general categories,         03:28

21  we've explained to the Court why we've done it.  We would like

22  to get to a point where we can resolve whatever other sort of

23  runoffs that we can with counsel, and then narrow down what are

24  truly witness statements and what are truly witnesses that are

25  going to be called so that any dispute that we have is a           03:29

1    relatively small subset of a larger group of -- a larger set of

2    witness statements so that the Court isn't overburdened with

3    these things that we can't resolve.

4              THE COURT:  All right.  Well, it seems to me that the

5    upshot of what you've been discussing so far, with respect to              03:29

6    discovery that's has been turned over but it's redacted, is

7    that once some dates are set, including a date by which the

8    Government will give a preliminary list of its witnesses, then

9    the parties ought to be in a better position than you are in

10   right now to discuss what -- what the disputes really are              03:29

11   about, documents that have been, according to the defense,

12   over-redacted.

13             So I think what I'll do is set, in terms of

14   deadlines, is set a deadline -- well, require the parties to

15   meet and confer with respect to any particular documents that              03:30

16   the defense is claiming have been redacted beyond the proper

17   scope.  And then that -- I think combined with setting some of

18   these other deadlines -- should narrow the scope of this

19   dispute.

20             MR. AARON:  Your Honor, I appreciate the Court's              03:30

21   effort to kind of negotiate around a thorny area, but I think

22   the premises of the solution is questionable.  Because what the

23   Government is saying is, basically, we want you, the defense,

24   to tell us why you think this should be unredacted.

25             I think the scope should be the Government should              03:30

 1   tell us --

 2            THE COURT:  Let me interrupt you for a moment.

 3            I think -- well, some material has already been

 4   turned over with redactions.  And then there is some material

 5   that -- a great deal of material, as I understand it, will          03:31

 6   still be coming.

 7            MS. DEWITT:  That's right, Your Honor.

 8            THE COURT:  So to the extent that the Government

 9   redacts anything in the future, it needs to indicate, in

10   general terms, not line by line but let's say material in a         03:31

11   document, the basis to the defense at the time it produces it

12   for the redaction -- I mean the privilege that's being claimed

13   -- or not strictly speaking of privilege, the basis on which

14   the Government is withholding that information for the future.

15            Then, as to documents that have already been turned        03:31

16   over, I understand your point that it's not the defenses'

17   burden to -- it's initially, if it's covered under Rule 26.2 --

18   and not everything here is -- it is not the defendants' burden.

19            But in terms of meeting and conferring before a

20   motion is brought on particular documents or I'm asked to          03:32

21   review something in camera, the parties need to meet and

22   confer.  And I don't think that shifts the burden.

23            Now, do you wish to be heard as to anything that's

24   the requirement that things be redacted in the future be

25   accompanied by an explanation for the basis for the redaction?     03:32

1      MS. DEWITT:  There may be instances where that

2  information needs to be provided in terms of the category, Your

3  Honor, but, no, generally we have no problem with that.

4      THE COURT:  All right.  What other issues remain to

5  be discussed besides timing?                                    03:32

6      MR. AARON:  The Court wanted to hear argument

7  regarding the discovery of information related to the arrest,

8  detention, and medical treatment in Afghanistan.

9      THE COURT:  Go ahead.

10     MR. AARON:  I think this information is important,           03:32

11  for a couple of reasons, not only to the facts surrounding the

12  arrest, detention, interrogation --

13     THE COURT:  Well, let's narrow it down.

14     First of all, I said given the explanation that you

15  had in your motion, and maybe it was in the reply, as well,     03:33

16  about why you wanted this information.  I said it seemed to me

17  that medical records that the Government has should be turned

18  over.

19     Do you have any objection to that?

20     MS. DEWITT:  I apologize, Your Honor.  I was actually        03:33

21  flipping back to a question.

22     One concern I have about the redactions -- and I

23  apologize for the lost train of thought.  One complication may

24  be that in instances where there may have been classified --

25  there may be classified information redacted from a document,   03:33

```
 1   it would be inappropriate for us to note that in fact there
 2   even is classified information that's being redacted.
 3           So that's one complication that I can think of.
 4           THE COURT:  So what do you propose in that case?  How
 5   do you propose to identify, other than saying, it's classified?   03:33
 6   I understand the issue there, but what do you propose?
 7           MS. DEWITT:  More generically describe it as
 8   sensitive information, sensitive law enforcement information.
 9   And if there is a dispute with counsel, then that may be
10   something that we have to take up.                                03:34
11           THE COURT:  I understand that when it comes to things
12   like that I may have to do an in camera review for those
13   purposes.
14           MS. DEWITT:  And I'm sorry.  You asked me a question,
15   and I apologize for not responding.                               03:34
16           THE COURT:  My question was, as to the documents that
17   the defense is seeking regarding the arrest and detention and
18   so forth of Mr. Aaron's client, Mr. Kabir, I said at the
19   outset, in describing my tentative ruling on this issue, that
20   the Government -- I'd be inclined to order the Government to       03:34
21   turn over any medical records that it has as to Mr. Kabir for
22   any treatment that he got while he was in detention at the time
23   of his arrest or after, if there are any.
24           MS. DEWITT:  Any records that would have been after
25   his arrest -- just to be a little bit preciser, he was arrested   03:35
```

1    by the FBI.  There are not -- I don't believe -- any records,

2    unless there was some notation by the medic on the plane about

3    him getting records, or anything that might be at the MDC.

4              So that's a different issue.

5              As to any medical records that may have been -- that      03:35

6    may exist when he was captured that would be in the possession

7    of an agency other than the Department of Justice, we can

8    certainly request those documents, Your Honor.  And if there is

9    any problem with producing those documents, we will let the

10   Court know and let counsel know.                                   03:35

11             THE COURT:  All right.  So in the meantime, to the

12   extent you will investigate as to whether there are any

13   documents including simply notations or anything from a medic,

14   or anybody, as to any medical treatment provided at or after

15   the time of arrest before he was in BOP custody at the MDC?       03:36

16             MS. DEWITT:  Yes.

17             THE COURT:  All right.  So that's one category.

18             Mr. Aaron.

19             MS. DEWITT:  Mr. Aaron may be referring, actually, to

20   keep Mr. Kabir's medical records at CDC himself so we don't       03:36

21   have to --

22             THE COURT:  Right.  You may need to subpoena -- the

23   defense may need to subpoena them, to the extent that they are

24   in the custody of the Bureau of Prisons at MDC.  You don't have

25   custody of those, so --                                           03:36

1          MS. DEWITT:  We can ask for them, as well, and I'm

2    happy to do that.  I will confirm whether or not there is any

3    specific records that is from FBI taking custody and arresting

4    forward, and then we'll make efforts to find out what the

5    status is of anything before that.                          03:36

6          THE COURT:  Before that.  All right.

7          Mr. Aaron.

8          MR. AARON:  Three things.  Our view is different.

9          An arrest is the seizure of the person when he was

10   seized and beaten and detained by United States forces in     03:36

11   Afghanistan.  We view that as arrest.  He received medical

12   treatment before, during, and after his interrogations, and we

13   want details of all of that.  All of that bears upon the

14   voluntariness and his comprehension of the interrogation

15   process.                                                     03:37

16          Secondly, Your Honor, the problem with the discovery

17   orders -- the protective order -- is that the Government has

18   come up with a new form of evidence called, *sensitive but not*

19   *classified.*  I do not know what that means.  I understand the

20   other statutes dealing with protected information, national    03:37

21   security, and that sort of thing.

22          THE COURT:  Let's not talk about the protective order

23   for the moment.  Let's focus on -- let's not go backwards.

24   Let's try to focus on this issue.

25          MR. AARON:  Right.                                    03:37

1           THE COURT:  What you're arguing is that you want

2   materials about your client's medical treatment, et cetera,

3   before the FBI took custody of him?

4           MR. AARON:  Yes.

5           THE COURT:  But as I heard, as I understood what          03:37

6   Ms. DeWitt said a moment ago, she said the Government would

7   make -- would investigate and make efforts to find those

8   records.

9           Am I right?

10          MS. DEWITT:  To find them and to ask for approval --     03:38

11  ask for permission to provide them in discovery.  Yes, Your

12  Honor, we will make those efforts.

13          THE COURT:  All right.

14          MR. AARON:  And I think this was something we had

15  requested in our discovery letter and informally, as well.     03:38

16          And if I might, Your Honor, I know the Court doesn't

17  want to go back, and I understand that the Court -- well,

18  perhaps I'm misstating, but I think I understand the Court is

19  imposing on counsel in this case a meet-and-confer requirement

20  before there is further discovery motions.                     03:38

21          THE COURT:  Yes.

22          MR. AARON:  That's fine.  But I would like the Court

23  to know that we not only submitted a discovery request in a

24  formal letter, but we had sent discovery e-mails with specific

25  supplemental requests.  And one of the reasons I filed the     03:38

1   motions, as I told --

2         THE COURT:  We don't need to rehash that.  I know you

3   attached those letters and those e-mail communications to the

4   motion.  I'm not -- I don't want to focus on criticism of any

5   past behavior of either side or both sides.  I really want to          03:39

6   move forward and try to come up with ways that discovery can

7   flow more smoothly in the future.

8         MR. AARON:  Yes.  Well, the Court is going to order

9   them to provide records of the medical treatment, and they are

10  going to provide that.  That's fine.  If I could get those          03:39

11  within, say, the next -- if the Government could tell me at its

12  earliest convenience when they expect to have those records,

13  that would be helpful.  Because one of the problems we've had,

14  in dealing with the Government, is we will ask them for items

15  and they say, *Well, discovery is continuing and we are getting*          03:39

16  *it to you as quickly as we can.*

17        And we say, *Do you have any idea when we might have*

18  *that information?*

19        And they say, *No.*

20        So just to have an idea would help.          03:39

21        THE COURT:  Well, as far as the documents that the

22  Government is going to have to try to get from Afghanistan

23  before the FBI arrested -- I understand the distinction you're

24  making about when he was first detained and then an arrest,

25  let's call it that -- do you even know what agencies you would          03:40

1    be seeking those from?  Agencies or --

2            MS. DEWITT:  Department of Defense, Your Honor, and

3    we'll move as expeditiously as we can.  I will set up a call

4    with them later this week.

5            THE COURT:  All right.  So that would, I think, take          03:40

6    care of the medical records.

7            MR. AARON:  There was one more area that the Court

8    was going to entertain an argument, and that was on discovery

9    of the expert witness information.

10           We have talked to a number of expert witnesses           03:40

11   because we know, generally speaking, we have an idea from our

12   review of past cases in which the Government has prosecuted

13   similar charges, what types of experts they generally use.  For

14   example, in at least 26 terrorism and material support cases

15   the Government has called Evan Kohlmann as an expert, and           03:40

16   defense lawyers have called experts to rebut him.  If we know

17   for sure they are not going to be calling this person, then

18   that --

19           THE COURT:  Or an expert in such a category.

20           MR. AARON:  Right.  That would actually help the           03:41

21   defense because then we would not need to spend time and money

22   trying to counter that expert.

23           That's one of the reasons.

24           The other reason is that not only are these experts

25   expensive, but they are very busy.  So experts on Islamic           03:41

```
1   fundamentalism in Afghanistan, national security issues, things
2   like that, they are difficult to find.  They are expensive.
3           So the more discovery we have of what the Government
4   is going to do, the faster we can provide discovery of what
5   we're going to do.                                          03:41
6           THE COURT:  All right.  I think the only thing to be
7   said in response to that is, what is a reasonable time for
8   initial disclosures by the Government of its experts?  I mean,
9   to the extent the Government knows now its not going to call,
10  or it is going to call, any particular expert, I hope the    03:42
11  Government will in fact make that disclosure as soon as
12  possible.
13          But in any event, I am going to set a deadline today
14  for disclosures for both sides on experts.
15          So let's move to that.  I'm sorry just a moment.      03:42
16          MR. AARON:  Your Honor, if the Court is finished with
17  the discovery motions, may I have just a moment?
18          THE COURT:  Certainly.
19          MR. AARON:  Thank you, Your Honor.
20          I just wanted to reemphasize again we are not just    03:44
21  asking for the medical records.  We were asking for everything
22  in the motion, all the reports.  And I understand the Court is
23  going to consider that when making --
24          THE COURT:  Well, but I am just looking at it to see
25  what the other -- well, the motion said documents regarding the 03:44
```

1    circumstances of the arrest.  That's overbroad because I'm just

2    not clear what that means.  But to the extent that you're

3    seeking documents regarding any medical treatment, or anything

4    with respect to the injuries that you allege that he sustained,

5    I think that's covered in my ruling.                          03:45

6         MR. AARON:  Right.  In the discovery motion, we put

7    it, *all evidence, reports about Kabir's arrest, detention, and*

8    *medical treatment* -- I deleted the *and* -- *and medical treatment*

9    *in Afghanistan and transfer to the US*.

10        THE COURT:  Well, to say all documents regarding the     03:45

11   circumstances, his arrest, detention, that's overbroad.

12        MR. AARON:  Well, we don't have anything.  So any --

13   if we just had any documents, that would be a better position

14   than we are in now.  So to deny it wholesale and not give us --

15        THE COURT:  Well, I'm not denying it wholesale           03:45

16   because I'm saying that I certainly see the basis that you've

17   delineated for the medical records.  Because the basis for the

18   request, in general, is that you claim that your client was, in

19   your words, *severely beaten, and his injuries influenced his*

20   *ability to understand his rights to knowingly waive them and to*  03:46

21   *communicate with Government agents*.

22        So I think the medical records would be the records

23   that would bear on those issues.

24        MR. AARON:  Well, the Government maintained that he

25   tried to resist arrest.  So obviously, there is discrepancy in  03:46

```
 1   the factual narratives of how he --

 2           THE COURT:  I understand that.  And to the extent

 3   there is an issue as to how he sustained injuries, that's not

 4   relevant for the purposes of this case.

 5           If your client later brings a Bivens action, that's a      03:46

 6   different issue.  I mean, how the injuries were sustained -- I

 7   mean, whether it's the Government's version or yours, what's

 8   really the issue, as far as this case goes, is did he sustain

 9   injuries?  What's the extent of them?  And what's their effect

10   on his ability to communicate, and so forth?                       03:47

11           MR. AARON:  I understand the Court's position, but I

12   do think it is important how he sustained the injuries.

13           For example, just one quick hypothetical.

14           If the Government's United States forces say,

15   Mr. Kabir, you're under arrest, for whatever, and he says,         03:47

16   Okay, and he submits, and they immediately hit him with a rifle

17   butt and knock him unconscious or inflict other injuries, it's

18   going to have an effect on how he responds to an interrogation.

19           If, on the other hand, he engaged, as the Government

20   claims, in mutual combat with the special forces soldier, that     03:47

21   also might have an effect on how he would respond in his

22   interrogation.

23           But clearly, if someone is just beaten without cause,

24   that will cause them --

25           THE COURT:  Well, your client was -- that's not            03:47
```

1  information that's -- your allegations regarding, if you make

2  them later on, any statements made by your clients at certain

3  points are not admissible, for the reasons related to what

4  you've just described as a hypothetical, that would be the

5  subject of a motion to suppress, I'm sure.  And the basis for          03:48

6  it would be the testi -- I mean, your client's declaration as

7  to mistreatment he received that effected the voluntariness of

8  the statements, that's the context on which I see that being

9  relevant and being the subject of a motion to suppress.

10          MR. AARON:  That's true.  But what if there was --          03:48

11  and we don't know what evidence is out there.  What if the

12  special forces soldier say, *Yes, when we arrested him, we did*

13  *beat him.  That's our custom, is to subdue so there is no*

14  *possibility of resisting arrest?*

15          Their interest is not in complying with the terms --          03:48

16  Rules of Criminal Procedure or *Miranda*.  Their interest is in

17  apprehending someone who they think is engaging in material

18  support of terror.  So those types of reports may actually

19  support Mr. Kabir's argument.

20          THE COURT:  I'm not sure I -- I'm not sure I follow          03:49

21  your logic there, but -- I mean, we could debate endlessly the

22  number of possible scenarios regarding your client's detention

23  and arrest.

24          If you bring a motion regarding the voluntariness of

25  the statements made, the Government will have to respond to it.          03:49

```
 1   And I don't think I can decide in a vacuum, or in advance, what
 2   material might be relevant to those issues, other than what
 3   I've already stated about the medical records.
 4            MR. AARON:  And, of course, we would need to have the
 5   actual evidence of the statements, which I understand -- which   03:49
 6   I would assume that since that is part of the rules of Rule 16
 7   and Rule 26.2 discovery, that the Court would expect the
 8   Government to provide that as well.  Because so far, we don't
 9   have any information as to what he supposedly told law
10   enforcement or the military or special forces during that       03:50
11   period of time.
12            THE COURT:  Well, to the extent that the Government
13   isn't going to use any of those statements during its
14   case-in-chief or during trial, for that matter, what's your
15   position on that?                                                03:50
16            MS. DEWITT:  Are you talking about the statements of
17   his post-arrest, post-detention, Your Honor?
18            THE COURT:  Both.
19            MS. DEWITT:  It's not the Government's intention to
20   use, in its case-in-chief, statements made by Mr. Kabir when he  03:50
21   was in Afghanistan prior to being taken into custody by the
22   FBI.
23            MR. AARON:  I think we are entitled to those
24   regardless of whether or not the Government is intending to use
25   them under Rule 16.  It's important for the defense to have      03:51
```

1    those statements because if he were to decide to testify at

2    trial we would have to know what, if anything, the Government

3    would intend to impeach him with.

4           THE COURT:  Ms. DeWitt.

5           MS. DEWITT:  I think that the Court -- the Court's                    03:51

6    analysis at the start of this hearing, Your Honor, is exactly

7    correct, that medical records, to the extent that they could

8    arguably relate to the defendant's ability to communicate,

9    there may be some appropriate discovery in that regard.  The

10   Government is prepared to or will shortly produce Mr. Kabir's            03:51

11   post-arrest 302.  And I think the Court is -- counsel is sort

12   of turning this argument on its head by saying we have to have

13   the statements to know whether they were voluntary before we

14   can challenge that they are voluntary.  And I don't think

15   that's a correct analysis.                                              03:52

16          The Court is exactly right.  If he wants to challenge

17   any voluntariness of any statements that the Government intends

18   to use at trial, that the Government would have to respond to

19   that, and would respond to that, or lose the motion if it did

20   not.  And to the extent that the Government has any other               03:52

21   *Brady*, *Giglio*, or other -- *Brady* or other arguable discovery

22   obligations, the Government will discuss those issues as it

23   can.

24          THE COURT:  Well, Rule 16(a)(1)(A) is limited to

25   statements that the Government intends to use at trial.                 03:52

1          MR. AARON:  I thought the Government had to provide

2     all statements from the defendant.

3          THE COURT:  Well, I'm telling you that 16(a)(1)(A)

4     says, *Upon request, the Government must disclose the substance*

5     *of any relevant oral statement made by the defendant before*

6     *over after arrest in response to interrogation by a person the*

7     *defendant knew was a government agent if the government intends*

8     *to use the statement at trial.*

9          And then subsection (B) says, again, *Upon request,*

10    *must disclose and make available for inspection*, et cetera, *any*

11    *relevant written or recorded statements by the defendant if:*

12               *The statement is within the government's control; and*

13               *The attorney for the government knew, or with*

14    *reasonable diligence would have known that the statement*

15    *exists.*

16         The first part of the Rule clearly only applies to

17    statements that the Government intends to use at trial.

18         Subsection (B) does not limit itself to statements

19    that the Government is going to use at trial.  But I guess it

20    seems to me perhaps not an issue, but perhaps an issue, is in

21    this case if the statement is within the government's

22    possession, custody, or control, if it's the Department of

23    Defense, that's still the government.  So those would have to

24    be turned over at some point.

25         MS. DEWITT:  Your Honor, it's the Government's

1  position that those would only be subject to discovery if they

2  are -- if they contained *Brady* information.

3          THE COURT:  Well, that's not the clear language of

4  the Rule.

5          MS. DEWITT:  Your Honor, to -- I think to fully                03:56

6  address this issue will require some further briefing to the

7  Court.  But I think that the key -- the key issue here is, is

8  whether it's in the Government's possession, custody and

9  control, whether it is in fact relevant, and whether it's

10 relevant and helpful to the defense.                                    03:56

11         To the extent that it is not relevant and helpful to

12 the defense, it is our position, under case law, that it is not

13 -- that we have no discovery obligations with respect to the

14 statements that may be in control of the Department of Defense.

15         THE COURT:  All right.  Well, then as to that, my --          03:57

16 in terms of medical records, I've already made the position

17 clear about that.

18         In terms of other statements, if there is, in the

19 course of your investigation with respect to your discovery

20 obligations, if you find there are such statements and you're      03:57

21 going to take the position that they do not need to be turned

22 over -- they are not covered under Rule 16 subsection

23 (a)(1)(B), then you can move the Court accordingly.

24         MS. DEWITT:  We will do that.

25         THE COURT:  All right.                                        03:57

```
 1            MR. AARON:  Your Honor, the last issue that I had is

 2   we had briefly talked about this, and I don't remember the

 3   Court making any ruling on it.  And if so, if the Court did, I

 4   apologize.  But one of the problems we have regarding the 270

 5   hours of various conversations on the 63 DVDs is that we do not      03:57

 6   know the speakers of the conversations.

 7            If the Government could simply identify the speakers

 8   to the conversations, we can identify our client's voice.  He

 9   doesn't appear on those conversations.  We can identify the

10   informant, but we can't identify the other speakers.                03:58

11            THE COURT:  Well, that goes -- I think that goes back

12   to the issue of transcripts to be provided if the Government --

13   first of all, if the Government intends to use any of the

14   recordings, or whether they are video or audio, the audio

15   portion of any recordings, then I'm going to set a deadline for     03:58

16   transcripts.

17            That leaves open the question of whether the

18   Government should be ordered to -- if it's not using a

19   particular -- if it doesn't intend to use anything in a

20   particular recording, should it be required to identify the         03:58

21   speakers?

22            Ms. DeWitt.

23            MS. DEWITT:  A couple of things on that, Your Honor.

24            First of all, in addition to the audio, the

25   Government has provided some transcripts already.  It has           03:58
```

 1   provided many summaries of those conversations, which

 2   themselves identify the speakers, and/or many of these

 3   conversations the defendants or themselves are participants,

 4   obviously, and they clearly can identify the speakers who they

 5   were speaking to.                                                    03:59

 6            So this is a little bit of, I think, a false issue.

 7            And, yes, it does require, at least in some -- to

 8   some extent marrying up the summary or the transcript with the

 9   actual audiotape.  In some instances they are even -- you can

10   see who is speaking.                                                 03:59

11            THE COURT:  To the extent there is a video recording?

12            MS. DEWITT:  Right.  So there is a little bit of a --

13   there's a mix and match here.  Some of them you can tell from

14   watching the videos.  Some of them you can tell because it's

15   obvious to anybody, if you watch a couple of them, whose voice     03:59

16   is who.  Even I can recognize some of the voices from listening

17   to them, many of the voices.  Some of them do have summaries

18   that clearly identify who is a participant in that

19   conversation, and then you can figure out from that who they

20   are.                                                                04:00

21            With respect to transcripts, yes, the Government

22   wants to and is working on preparing transcripts, would like to

23   be able to use transcripts for anything it plays to the jury,

24   would like to be able to provide for anything that it intends

25   to use at trial: a transcript to counsel and the Court and to      04:00

1   the jury.

2           So that's something that we are working on and fully

3   intend to do.

4           It is not, however, very feasible to transcribe every

5   single minute of hundreds and hundreds of hours of tapes.  So          04:00

6   we're trying to identify --

7           THE COURT:  Well, and I'm not going to require that.

8           MS. DEWITT:  Thank you.

9           We're trying to prioritize those and provide those to

10  counsel, and we will do so as quickly as we can.  And some of          04:00

11  those are already in progress, and some of them have already

12  even been provided.

13          MR. AARON:  Your Honor, this is exactly what the

14  cases that we cited in our briefs, the voluminous cases where

15  the Government dumps a bunch of undigested, uncategorized              04:01

16  discovery on the defense, where the judges talked about the

17  unfairness of this.

18          They talk about paraphrases to the conversations.

19  Where are they?  Are we supposed to hunt through these

20  thousands of pages, carefully pick out the paraphrases, then          04:01

21  listen to all 270 hours and come up with which ones match, when

22  the Government can simply tell us?

23          Are we supposed to identify the participants that

24  I've never heard speaking?  I haven't heard Mr. DeLeon,

25  Mr. Gojali, or Mr. Santana speaking.                                  04:01

1          THE COURT:  I think the Government -- Government

2    counsel's suggestion, in terms of what's really here, is that

3    there is a number of video recordings, and if those are watched

4    -- even a few, not all, but even a few -- it would be from that

5    that Government -- excuse me, that defense counsel could          04:01

6    determine who the speakers are on things that are not on video.

7    That's the first thing.

8          But I think that given that, and given the amount of

9    information here, the solution for this issue is a deadline for

10   the Government to produce the transcripts of the parts of the    04:02

11   tapes, or any of the recordings, that the Government intends to

12   use at trial.

13         I understand that the defenses' position is going to

14   be that there is other material that the Government wouldn't

15   use at trial and it needs -- that doesn't mean it's only going   04:02

16   to review what the Government is going to use.  But I'm not

17   persuaded that it's necessary for the Government -- necessary

18   or possible for the Government at this point to give sort of a

19   glossary of every speaker on every portion of what's been

20   produced.                                                        04:02

21         So let's move to the trial date.

22         I could set the matter for trial in early February,

23   which I guess is everyone's -- I could set it in January.  I

24   have -- well, I only have civil matters that are set for trial

25   in January, so this case would take precedence.  But I could     04:03

1    set it for -- I have some civil cases set in February too, but

2    I could set it for trial on February the 3rd.  Is that the

3    trial date or the --

4            THE CLERK:  The 4th.

5            THE COURT:  It would be February the 4th.                04:03

6            So that's what I'm inclined to do, and very

7    reluctantly.  But the parties should view this -- just so it's

8    as clear as possible -- that this is the trial date.  And I'm

9    unlikely to entertain seriously any -- without really a showing

10   that something completely unanticipated and that couldn't have    04:04

11   been anticipated has occurred, to change that date again.

12           If we set it for trial on February the 4th, and I'd

13   set the pretrial conference or January the 13th.  I'm also

14   going to set a separate deadline in this case, to the extent it

15   may be necessary, for the hearing of any Daubert motions, which   04:04

16   would be ahead of that date.

17           So with a trial date of January the 4th -- excuse me,

18   February the 4th, a pretrial conference date of January 13th.

19   And at the pretrial conference, I would hear motions -- they

20   could always be filed earlier, but that would be the last date    04:05

21   for hearing any motions with respect to 404(b) evidence,

22   motions, other motions in limine, and just to be clear, any

23   motions with respect to any evidentiary issues, other than

24   motions addressed to the issues raised in *Kumho Tire* and

25   Daubert, those should be heard, filed timely to be heard no       04:05

1    later than December 16th.

2            MR. AARON:  I'm sorry, Your Honor, I got confused.

3            I thought the motions re 404(b) motions in limine and

4    evidentiary issues should be 1/13/13.

5            THE COURT:  Correct -- '14.                              04:06

6            MR. AARON:  1/13/14, I beg your pardon.  And then the

7    next date is in December for which motions?

8            THE COURT:  Motions under *Daubert* or *Kumho Tire*,

9    motions regarding expert witnesses.

10           MR. AARON:  And that's December?                        04:06

11           THE COURT:  16th.  Those are the last days for

12   hearing.  You can always file your motions earlier, but those

13   are the last days.  Motions should be filed three weeks

14   beforehand; the opposition a week later; the reply the next

15   week.                                                           04:06

16           MR. AARON:  The Court's standing order says four

17   weeks.

18           THE COURT:  Oh, I'm sorry.  That would be four weeks,

19   that's right, in order to get the reply in.  I apologize.  So

20   28 days.                                                        04:06

21           All right.  The deadline for witness lists.  The

22   Government should file its preliminary witness list, or file it

23   and, of course, disclose to defense, by early September.  I'm

24   thinking about September the 9th.  The Government is allowed to

25   supplement that.  But the witness lists, both sides -- well,    04:07

1    just the Government at this point should -- may file its

2    supplements on a rolling basis as you learn of other witnesses

3    you're going to call at trial.  Of course, other than rebuttal

4    witnesses, disclose to the defense by the date of the pretrial

5    or -- by the date of the pretrial conference, I would get final    04:08

6    witness lists from both sides or from all sides.

7            With respect to the defense, of course, that means

8    experts -- and I'll get into the deadlines for experts.  The

9    defense may not know, you know, who its witnesses are, but to

10   the extent that the defendant -- any of the defendants -- know    04:08

11   of other witnesses that they are going to call, those should be

12   disclosed at the time of the pretrial conference.

13           The Government's designation for expert witnesses --

14   I'm going to suggest, unless someone convinces me otherwise --

15   October 21st.  And the defense -- well, let's make that October    04:09

16   the 7th.  I'm sorry.  The defense designation of experts by

17   October the 28th.  And when I say "designation," that means the

18   information that's required under Rule 16 in terms of summary

19   of testimony, and so forth.

20           Now, for transcripts, the Government -- I think the        04:10

21   -- again, the Government, as it prepares transcripts for

22   anything that it intends to use at trial, should turn those

23   over as soon as they're available.  But I would expect that the

24   bulk of those transcripts would be turned over at the time that

25   the Government -- by September the 9th.  And then if there are     04:10

1    additional transcripts that are going to be used at trial, no

2    later than January the 6th.

3            Exhibit lists.  The Government's preliminary exhibit

4    list to be served and filed by December the 2nd.  And then the

5    final exhibit list should be disclosed by January the 6th.          04:11

6    That's a week before the pretrial conference date.  There is

7    always one or two exhibits -- well, I hope there won't be more

8    than one or two -- that one side or the other, either the day

9    of the pretrial conference or after the pretrial conference,

10   wishes to add or delete.  And for good cause shown, I would        04:11

11   allow that as to adding.  I never require much if you're going

12   to delete exhibits.

13           The information with respect to any confidential

14   source, I mean, that would come with the -- I think that just

15   comes within the witness designation dates that I've already       04:12

16   set.

17           MR. AARON:  And that would include cooperating

18   witnesses as well?

19           THE COURT:  To the extent the Government knows who

20   its going to call at trial by the dates I've set, yes.             04:12

21           And the last time you were here the Government -- I

22   don't know that it's really changed much -- the Government gave

23   a time estimate.  I think it was 20 court days.

24           Do you have anything to add on that point?

25           MS. DEWITT:  At this time, Your Honor, I think that        04:12

1    that is still a solid estimate for the trial date.

2            Can I ask for one clarification?

3            THE COURT:  Certainly.

4            MS. DEWITT:  On the witness list, is it sufficient

5    for the Court, with respect to custodian of records where we    04:13

6    may not know exactly who Sprint is going to send, or whatever,

7    that we can just list "Sprint" as custodian of record?

8            THE COURT:  Yes, absolutely.  I would hope, when it

9    comes down to trial, we won't have to put any custodians on the

10   witness stand.  If I have to revisit that at the pretrial    04:13

11   conference, I will.  But unless there is really a debate about

12   something being authenticated, this trial is going to be long

13   enough.  It's going to be hard enough to pick a jury as it is,

14   without making it longer.

15           But that brings up the last question I wanted to    04:13

16   discuss with counsel, and that is a questionnaire for a jury.

17           What I've been thinking of so far, to try to keep the

18   expense to the Court and the resources of both sides -- well,

19   just to contain those -- it seems to me that we might want to

20   send out a couple of questionnaires in this case.  The first    04:14

21   one would be just a simple time qualifying questionnaire.  I've

22   done this -- and I'm sure both sides have had lots of

23   experience with questionnaires, but it seems to me that the

24   last thing we want to do is to call in the hundreds of people

25   that we might need to call in to get a jury of, you know, a    04:14

```
 1   jury of 12 and the correct number of alternates -- the
 2   appropriate number of alternates -- is to bring them into the
 3   courthouse and then for the first time find out who can serve
 4   on a four- or five- or six-week trial.  So it only is the cost
 5   of postage, which still is pretty high, for the kind of jury          04:14
 6   pool we'd be looking at here.  But to first send out a
 7   questionnaire that simply says the trial date -- for a criminal
 8   case, we have a trial date set for February the 6th.  Are you
 9   available to serve on a trial that's estimated to last X number
10   of days?  And also tell them that we wouldn't be in session on       04:15
11   Mondays, so that people have a pretty clear understanding of
12   what's involved.
13           And if you aren't, then explain why not.
14           And then once those responses come in, we can go
15   through some time qualifying, see which of the responses that        04:15
16   counsel are willing to stipulate to or that I would grant a
17   hardship for.
18           Then of the group that we have the hardship -- we've
19   selected, at least preliminary out of hardship, we could send
20   another questionnaire again before they come into the               04:16
21   courthouse, with a few, ten or less questions, that are
22   directed to the substance of the case.  That way, when the jury
23   -- again, the purpose of that would be there might be some
24   prospective jurors that all counsel would stipulate based on
25   their responses to the second questionnaire, and they wouldn't      04:16
```

```
 1   even need to come to the courthouse.
 2           As to others where, whatever the responses are, that
 3   would give counsel the opportunity to, during voir dire, refine
 4   what their questions are going to be of a particular juror.
 5           And when I say "ten or less questions," that's really      04:16
 6   what I mean.  I think what I envision for the second
 7   questionnaire is not even the name of the case, because we
 8   don't want to allow jurors to go and collect information, but
 9   just a brief agreed-upon description of the nature of the
10   charges and a few other questions that would relate to jurors'    04:17
11   ability to, you know, carry out their duties, to apply the
12   presumption of innocence, to listen to all the testimony,
13   whether they have -- if you want to include some questions
14   about if they've lived in certain parts of the world, that
15   might be appropriate.  But counsel should give some thought to    04:17
16   that.  Because in order to do this properly, we need to send
17   out the questionnaires quite a bit of time ahead of the trial
18   date, especially if we're going to do it in two steps, like I'm
19   proposing.
20           First of all, does anyone have any objection to           04:17
21   sending out a time qualifying questionnaire?
22           MR. AARON:  Speaking for Kabir, I do not.
23           I just wanted to clarify the estimate given by
24   Ms. DeWitt of 20 court days, that's for the Government's
25   case-in-chief?                                                    04:18
```

```
 1            THE COURT:  I believe so.

 2            MS. DEWITT:  Yes, Your Honor.

 3            THE COURT:  So we're going to be intending to tell

 4   the jury -- well, 20 court days is five weeks.  So we would be

 5   telling prospective jurors -- and maybe this will be refined by   04:18

 6   the time we get around to sending this questionnaire out -- but

 7   we would be telling prospective jurors probably seven to eight

 8   weeks.

 9            MR. AARON:  Yes.

10            THE COURT:  Does anybody have any objection to, first   04:18

11   of all, sending out a time qualifying questionnaire?

12            MR. SCOTT:  No, Your Honor.

13            MR. DRIGGS:  No.

14            THE COURT:  We would probably need to send that out

15   in November.  So I will circulate or file -- apprise counsel of   04:18

16   what I would intend to do in terms of notifying prospective

17   jurors.  Very little about the case, just the length of time

18   and, you know, what, if they think they have an extraordinary

19   hardship.  And you can comment, object, et cetera.

20            Then out of that pool, counsel will have a chance,   04:19

21   when you get the responses in, to look at the responses, unless

22   you decide that you -- we're going to have to send out

23   thousands of these.

24            So when I've done this in the past, sometimes counsel

25   have -- you would get to see them but would have no objection   04:19
```

1   to the Court making the time qualifying decisions.  But you may

2   or may not want to do that once you have taken a look at what

3   the responses are.

4          Once we sorted through the questionnaires, in terms

5   of time responses, then we would send probably -- if we send          04:19

6   them out in November, we give people two weeks, and I think now

7   by that time this division is going to be part of a pilot

8   project in this district to have online responses, so some

9   people may be able to respond online.  So that would speed

10  things up.  But allowing a month for that, then by December we      04:20

11  should send out the second questionnaire.

12         So counsel should meet and confer about the contents

13  of the second questionnaire and a deadline for submitting

14  either an agreed-upon one, which doesn't mean that I'm -- I've

15  seen some agreed-upon ones in other cases that were sent out        04:20

16  that were far too long.  The fewer questions you ask, the

17  higher the quality of the response is going to be.  If you ask

18  ten questions, you're going to get better responses than if you

19  have seven pages.  By the time you get to page 6, you're going

20  to get "yes" or "no."                                                04:21

21         So ten questions or so.  And that should be submitted

22  -- either an agreed-upon one or both sides' versions, which I

23  hope would not have many disputed areas -- no later than

24  October 28th.

25         MS. DEWITT:  May I inquire, Your Honor?                       04:21

1          When you say "time qualify," are you saying to

2   strictly limit it to your ability to serve this amount of time?

3          THE COURT:  Right.

4          MS. DEWITT:  And I agree with you that the less

5   questions you ask in a substantive one the better because you          04:21

6   get better answers, but is it your practice, or is your

7   preference to include some hardship-type questions that are not

8   time related in that, as well?  Or to wait until they come in?

9          THE COURT:  Well, I'm not sure what you mean by

10  hardship questions.          04:21

11          MS. DEWITT:  Inability to hear, understand, or, you

12  know --

13          THE COURT:  That's on the summons that they get.  The

14  questions about, Can you understand, comprehend English?  Do

15  you have a hearing disability?  All of those things are covered          04:22

16  on the summons that they get.

17          MS. DEWITT:  My experience is it's not necessarily --

18          THE COURT:  Well, my experience is the same.

19  Sometimes you get people in the courtroom and it's not until

20  you're about to swear them in that they decide they have either          04:22

21  a disability or are not fluent in English.

22          MS. DEWITT:  Somebody who can't sit that long because

23  they have a back problem, or something like that, is that

24  something --

25          THE COURT:  Oh, that's something that goes in the          04:22

```
 1    time qualifying.  Is there any reason why you cannot sit on a
 2    trial for this length?  That would include someone who says, I
 3    can't -- I have to use the restroom every 15 minutes.
 4              It's not strictly time qualifying in that sense.
 5    Because if the question is, Would you be able to serve on a       04:22
 6    jury of this -- a jury trial that lasts this long, you're going
 7    to get a lot of answers.
 8              MS. DEWITT:  Understood.
 9              THE COURT:  But it's not substantive questions about
10    -- because they won't know anything about the case.  They're     04:23
11    just going to know the length of the trial.
12              Any other questions about that process?
13              Anything else that any side wants to bring up at this
14    time?
15              MR. AARON:  Yes, Your Honor.  I have two issues.        04:23
16              One, I would make my pitch for having the expert
17    witness disclosure for the Government be the same as for the
18    witness list, in part because those witnesses the Government
19    would know perhaps even earlier than the regular witness list,
20    and the amount of work that the defense needs to do for those    04:23
21    witnesses is going to be greater.  And the types of persons
22    that we're dealing with, in terms of trying to get them as
23    experts -- people who are experts on national security, area
24    study, Islamic culture, or Arabic, that sort of thing -- they
25    do tend to get booked up way in advance.  So the more time --    04:23
```

```
 1              THE COURT:  Ms. DeWitt, do you have any objection to

 2     that?

 3              MS. DEWITT:  I'm sorry.  I want to make sure I

 4     understand the exact dates and how they interrelate.

 5              THE COURT:  Right now I set October the 7th and                   04:24

 6     October the 28th for the plaintiff's and defendants'

 7     disclosures on experts.

 8              And, Mr. Aaron, you're asking to move that up to

 9     early September?

10              MR. AARON:  Yes, 9/9, the same as the regular witness            04:24

11     list.

12              MS. DEWITT:  Well, Your Honor, my preference would be

13     to not have them on the same day so that the Government could

14     make sure that that list is as complete and final as possible,

15     and to allow us the time to focus on experts thereafter.                  04:24

16              If we know that we're going to retain an expert,

17     we'll certainly give them discovery when their report is ready,

18     or anything, if we have it earlier than that.  But there may be

19     some things that --

20              THE COURT:  Well, I think the defense is correct on              04:25

21     this issue, so I'm going to state September the 9th is the

22     Government's designation date.  And then three weeks after

23     that, which would be September the 30th, for the defenses'

24     designation date -- the disclosure date, I should say.

25              MR. AARON:  Thank you, Your Honor.                               04:25
```

1           MS. DEWITT:  And I assume, Your Honor, that we would,

2     for good cause, be able to supplement or if it's --

3           THE COURT:  Well, either side could for good cause.

4           MS. DEWITT:  And in response to his designations, as

5     well?                                                           04:25

6           THE COURT:  Yes.  You can respond to his designations

7     if there would be a rebuttal.  Both sides have to do that.

8           MS. DEWITT:  Thank you, Your Honor.

9           THE COURT:  Mr. Aaron, anything else?

10          MR. AARON:  Yes, Your Honor.                              04:25

11          Mr. Larsen is prepared to address the issue of the

12    protective order which has caused so much difficulty in this

13    case.

14          MR. LARSEN:  Not so much address, Your Honor, just

15    seek some clarification.                                        04:26

16          Originally, the Government proposed an order -- a

17    blanket order -- to cover all of the discovery in this case and

18    treat it as confidential.  Your Honor rejected that order and

19    said if the Government has items they want to seal or protect,

20    it should come forward and show cause of why they should be     04:26

21    made confidential.

22          And so we're just seeking clarification now as to the

23    status of the discovery that's been produced to date -- and

24    will be produced in the future -- as to whether it's subject to

25    any kind of order or whether it will be subject on a            04:26

1    document-by-document basis.

2            THE COURT:  I would hope it would be at least

3    category by category and not page by page.  But the parties do

4    need to -- it seems to me that the parties ought to be able to

5    agree.  And if you can't agree, then submit your -- the          04:26

6    Government can submit a proposed protective order, and you can

7    submit your objections to it.  But there ought to be a process

8    that you can agree upon for certain categories of documents or

9    -- well, at least certain -- this kind of goes to the redaction

10   issue -- certain categories of information.  If you can't agree  04:27

11   on it, then I'll, you know, review things in camera.

12           MR. LARSEN:  I think we certainly agree, as Mr. Aaron

13   said earlier, that we would have no objection to something

14   that, for example, imperils an ongoing investigation.  I think

15   the problem is that the Government hasn't identified to us       04:27

16   what, if anything, in the discovery fits that bill.

17           THE COURT:  Well, I'm not sure that anything -- I

18   don't know because I haven't seen the discovery.  But I'm not

19   sure the Government has turned over anything like that to this

20   extent.  I mean, unless you're talking about things that have    04:27

21   been redacted.

22           But if the parties -- for example, I think you've

23   gotten the strong hint from me that the Government has to

24   redact personal identifying information.  So that should be the

25   subject of the protective order.                                 04:27

1          Information regarding ongoing investigations and

2     unrelated cases, that is going -- I mean, there's a motion --

3     well, I think you can see where I'm going to go with that.

4          So to the extent that you have common ground, at

5     least come up with a protective order that agrees on as much as          04:28

6     you can.  And then to the extent there are objections, I will

7     rule on them.

8          MR. LARSEN:  And would the Court like to set a date

9     for a submission of a proposed order on that?

10         THE COURT:  You want to go outside this afternoon          04:28

11    until you agree -- and meet and confer until, you know -- I

12    could be here until midnight.

13         MS. DEWITT:  We've made diligent efforts to meet and

14    confer, Your Honor, and we will do so again.

15         THE COURT:  All right.  The deadline for a protective          04:28

16    order to be submitted -- that was intended to be humorous, but

17    I guess -- well, only semi because I would be here, but I'm not

18    going to order people to stay until you've -- at this point,

19    I'm not going to do that.

20         So I would want to see a protective order -- either          04:28

21    stipulated or to the extent there are any objections to certain

22    parts of it -- by May 20th.  That should give you plenty of

23    time.  That's three weeks from today.

24         MS. DEWITT:  Your Honor, just for the record because

25    there is some apparent confusion, which I don't really          04:29

```
 1   understand, counsel for Mr. Kabir, and the other counsel, had

 2   actually entered into stipulations with us regarding a

 3   protective order.  I understand that the Court has taken a

 4   position that that stipulation itself may be somewhat

 5   overbroad.                                                       04:29

 6               THE COURT:  Yes.

 7               MS. DEWITT:  But it is our position that the Court's

 8   order does not in any way undo that stipulation until and

 9   unless another order is entered by the Court.  Because that's

10   the premise that we're operating on, is that until we can get a  04:29

11   court order that this stipulation is bound, that we're bound by

12   this, or that the parties can reach a new stipulation, that the

13   parties will be bound by the previously --

14               THE COURT:  If the parties have previously entered

15   into an agreement, that's the agreement, but depending on the    04:30

16   terms of that agreement and the scope of it.

17               MR. LARSEN:  Just to clarify for the record, Your

18   Honor, we made clear to counsel for the Government we withdrew

19   our stipulation long ago.

20               In good faith, however, we have been observing the   04:30

21   terms of the proposed, yet rejected, protective order, and

22   that's why we're now seeking clarification.

23               THE COURT:  Well, as to Mr. Kabir only, then, on this

24   point, because I haven't, you know, in response to the

25   Government's application for entry of the protective order,      04:30
```

1    there was no opposition to that from other counsel.  But as to

2    Mr. Kabir, I'm trying to recall exactly when you notified the

3    Government that you were no longer in a position to stipulate.

4    When was that?

5           MR. LARSEN:  It was through e-mail.  I think we first    04:30

6    said it's been clear that we've withdrawn our consent and for

7    no other reason we're now opposing this order which you

8    described as even less restrictive, but now for the record we

9    are withdrawing our consent.  And that was via e-mail.

10          THE COURT:  But when, roughly?                           04:31

11          MR. LARSEN:  It would have been -- it would have been

12   after the filing of our opposition to the proposed protective

13   order.

14          THE COURT:  No.  I think it was before that, wasn't

15   it?                                                             04:31

16          MR. LARSEN:  I think we had made clear in

17   discussions, but if there was a formal, you know, if the

18   Government was asking us, Well, you agreed initially, you know,

19   to a protective order --

20          THE COURT:  And I've ruled.  You're right.  I ruled     04:31

21   that you were allowed to withdraw that.  But as to the other

22   defendants, that remains in place because they haven't objected

23   or sought to withdraw.

24          MS. DEWITT:  My only point, Your Honor, just to be

25   clear, is that the order -- the stipulation that the parties    04:31

```
 1   have agreed to, we produced discovery with the understanding
 2   that that would be abided by.  We asked counsel to either abide
 3   by that or give us the discovery back until we can get that
 4   resolved.
 5            THE COURT:  So you're just asking about the               04:32
 6   previously disclosed matters, not anything in the future.  I
 7   understand.
 8            MS. DEWITT:  Right.
 9            THE COURT:  Now I understand.
10            MS. DEWITT:  And we've also asked every time -- we've    04:32
11   actually produced significant amounts and made available
12   significant additional amounts since this supposed withdrawal
13   of the stipulation, and we have asked them to abide by the
14   stipulation.
15            THE COURT:  And Mr. Larsen has indicated they have        04:32
16   agreed to do that.  So that covers everything that has been
17   produced so far?
18            MS. DEWITT:  Yes.
19            THE COURT:  Yes.  I think everybody is in agreement
20   on that, yes.                                                     04:32
21            MS. DEWITT:  Thank you.
22            THE COURT:  All right.  I think that clarified it, I
23   hope.
24            MR. LARSEN:  Yes.
25            THE COURT:  Any other counsel wish to be heard on any    04:32
```

1    matters?

2              Mr. Driggs or Mr. Scott?

3              MR. DRIGGS:  No, Your Honor.

4              MR. SCOTT:  No, Your Honor.

5              THE COURT:  You'll get a written order with all of        04:32

6    these dates, of course.  Thank you very much.

7              MR. AARON:  Thank you, Your Honor.

8              THE COURT:  And you'll get a written order on all the

9    motions too.  And please return your copies of the tentative

10   ruling to the clerk.                                               04:33

11                      (Proceedings Concluded)

12                              -o0o-

13

14

15

16

17

18

19

20

21

22

23

24                      C E R T I F I C A T E

25

```
 1                    DOCKET NO. EDCR 12-92(A) VAP

 2
            I hereby certify that pursuant to Section 753,
 3    Title 28, United States Code, the foregoing is a true and
      accurate transcript of the stenographically reported
 4    proceedings held in the above-entitled matter and that the
      transcript page format is in conformance with the regulations
 5    of the Judicial Conference of the United States.

 6

 7

 8

 9     /S/ Phyllis A. Preston        DATED:  February 21, 2014

10    Federal Official Court Reporter

11    CSR, FCRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```